# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>100 F Street, N.E.<br>Washington, D.C. 20549,<br><br>       Plaintiff,<br><br>   v.<br><br>JONATHAN STRUM,<br><br>       Defendant. | Case No. 18-361<br><br>COMPLAINT |

Plaintiff, the United States Securities and Exchange Commission ("Commission") alleges as follows for its Complaint against defendant Jonathan Strum ("Strum"):

## SUMMARY

1.      This action concerns Strum's aiding and abetting a fraudulent scheme to create and sell publicly-traded shell companies.

2.      This "shell factory" was operated from Israel by Sharone Perlstein ("Perlstein"), Hadas Yaron ("Yaron"), and Aric Swartz ("Swartz") (collectively, the "Perlstein Group").

3.      Between 2010 and 2014, the Perlstein Group created at least fifteen fraudulent shell companies, which had virtually no assets or operations and no legitimate business purpose. With the assistance of an attorney and an accountant, the Perlstein Group then conducted sham U.S. initial public offerings of certain of the shell companies' securities, and then sold (or attempted to sell) certain of the shell companies to buyers seeking shell companies with publicly-traded shares.

4.      Strum nominally served as outside counsel to at least fourteen of the shell companies, but in reality he worked closely with the Perlstein Group in preparing the shell companies to issue shares to the public and shepherding them through the Commission's Form S-1 ("S-1") registration process.  Among other things, Strum (a) assisted in drafting the shell companies' false and misleading S-1 registration statements and periodic reports that were filed with the Commission, (b) assisted in drafting letters to the Commission responding to staff comments and questions regarding the S-1 registration statements, and (c) signed false and misleading opinion letters sent to certain of the shell companies' transfer agents to induce the transfer agents to issue unregistered and unrestricted shares to nominee shareholders.

5.      Strum knew or was reckless in not knowing that the Perlstein Group, and not the shell companies' purported officers and directors, were the actual control persons of the shell companies and that, by his actions, he was substantially assisting the operation of their fraudulent shell factory.

6.      Strum also knew or was reckless in not knowing that the registration statements and other documents that he assisted in preparing with regard to the shell companies on behalf of the Perlstein Group contained materially false and misleading statements and omitted material facts.

7.      By engaging in the conduct described in this Complaint, Strum aided and abetted the Perlstein Group's violations of the anti-fraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act"), [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  The Commission requests that this Court permanently enjoin Strum from violating the aforesaid statutory provisions and rule, and order disgorgement of ill-gotten profits with prejudgment interest thereon.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act

[15 U.S.C. §§ 78u and 78aa].

9.      Venue is proper in this judicial district pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Strum is

an inhabitant of and transacts business in this district; the offers of the shell companies'

securities took place in this district and Strum participated in those offers; and certain acts or

transactions constituting the violations occurred in this district.

10.      Strum, directly and indirectly, made use of the mails and of the means and

instrumentalities of interstate commerce in connection with the transactions, acts, practices, and

courses of business described in this Complaint.

**DEFENDANT**

11.      **Jonathan Strum**, age 59, is an attorney admitted to practice in Washington, D.C.

**FACTS**

**I.      The Perlstein Group's Fraudulent Shell Factory**

12.      Between 2010 and 2014, the Perlstein Group created at least fifteen shell companies,

including: Aquino Milling, Inc., now known as AV Therapeutics, Inc.; Duane Street Corp., now

known as Cur Media; Eco Planet Corp., now known as J.E.M. Capital Ltd.; Epsilon Corp., now

known as Gase Energy, Inc.; Flaster Corp.; iLoan, Inc.; Instride, Inc.; L3 Corp., now known as

Praetorian Property, Inc.; Lollipop Corporation; Marathon Bar Corporation, now known as

Lipocine, Inc.; Olie, Inc., now known as Syndicate Business Development Corporation; Olivia Inc.,

now known as Bio-En Holdings Corporation; Secure It Corporation, now known as Black Stallion

Oil and Gas, Inc.; Universal Tech Corporation, now known as Bay Stakes Corporation; and Zubra Inc.

13.     The Perlstein Group followed essentially the same process in creating each of these shell companies:

14.     The Perlstein Group formed a United States corporation, issued stock to nominee officers and directors, and created a phony business plan for the corporation.

15.     The Perlstein Group then engaged an attorney to assist in drafting filings with the Commission and hired an accounting firm to perform what would often be a sham audit.

16.     The Perlstein Group prepared S-1 registration statements for the shell companies, caused them to be filed with the Commission, and attempted to address comments from the Commission staff.

17.     Each S-1 registration statement claimed that the named corporation had a specified business plan.  Yet the S-1 registration statements filed with the Commission by each shell corporation concealed that: (a) the Perlstein Group had formed and solely controlled each corporation; (b) the Perlstein Group had created each corporation solely to sell it; (c) the Perlstein Group never intended to execute the business plan provided for each corporation; and (d) for each corporation, the Perlstein Group had installed nominee officers, directors, and shareholders whom the Perlstein Group controlled.

18.     After a shell corporation's registration statement was declared effective, the Perlstein Group orchestrated a phony initial public offering of the corporation's shares.  To accomplish this, the Perlstein Group typically sought approximately forty straw-man shareholders for each shell so that the company would not appear to be controlled by only a few individuals because the Perlstein Group thought that would be a red flag for regulators, including the Commission.

19.     The Perlstein Group signed a contract with a transfer agent on behalf of the shell by using the digital signature of one of the shell's nominee directors.  The Perlstein Group then sent a purported shareholder list to the transfer agent.

20.     The Perlstein Group — acting in the guise of one of the shell's nominee officers or directors — instructed the transfer agent to print stock certificates and a certified shareholder list and to send these documents to one of the corporation's purported officers or directors.

21.     To maximize the value of the shell to potential buyers, the Perlstein Group tried to make each shell's publicly-held shares eligible to trade in the over-the-counter market.  To accomplish this, Perlstein and Yaron arranged for a registered broker-dealer to file a 15c2-11 application ("211 Application") with the Financial Industry Regulatory Authority ("FINRA"), in order obtain a ticker symbol for the company's stock, allow the broker-dealer to publish quotes for the shell company's stock, and enable public trading of the stock.

22.     After FINRA had approved the 211 Application and assigned a ticker symbol to the shell corporation, the Perlstein Group filed applications on behalf of the issuers with The Depositary Trust Company to obtain "DTC eligibility," which enhances the value of the shell to buyers because the securities can be distributed quickly and efficiently.  DTC eligibility allowed the shares to be held in street name and traded electronically, which eliminated the need for brokers to physically transfer paper share certificates.

23.     As part of this process, the Perlstein Group sought to create the appearance of investor interest and active trading in the shell company's stock, in order to establish a price for the stock.  To accomplish this, Perlstein orchestrated phony trades by selling shares in one account he controlled and purchasing the same shares in another account he controlled.  This not only established a price for the stock, but also allowed him to maintain control of the traded shares.

24.     The Perlstein Group's ultimate goal was to sell the shell for a significant profit, usually through a reverse merger or a stock sale, to a buyer seeking a shell company with publicly-traded shares.

25.     The Perlstein Group collectively profited by over $1.8 million from selling shell corporations that they had created.

26.     By engaging in the conduct described above, Perlstein, Swartz, and Yaron violated the anti-fraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.     Strum's Substantial Assistance with the Perlstein Group's Fraud

27.     Early in the Perlstein Group's shell factory scheme described above, Perlstein instructed Swartz to engage a U.S.-based attorney who would work cheaply and would be willing to sign opinion letters, assist in drafting the shell companies' S-1 registration statements and periodic reports to be filed with the Commission, and perform other assignments in furtherance of the registration process.

28.     In 2011, Swartz approached Strum, for whom he had worked as a law student, about providing legal services in connection with the formation of start-up companies.

29.     Although Strum had little or no prior experience in securities law, in general, or in drafting S-1 registration statements, periodic reports, or opinion letters related to securities offerings specifically, he did have substantial legal experience.  At the time that he was approached by Swartz, Strum had been an attorney for over twenty-four years, but had been unemployed for several years.

30.     Swartz and Strum agreed that Strum would be paid $5,000 to $6,000 for his work with regard to each of the shell companies.  Strum did not have a retention agreement or

engagement letter with any of the shell companies, and did not speak with the purported

management of any of the shell companies regarding the engagements.

31.     From 2011 to at least 2014, Strum substantially assisted the Perlstein Group's

fraudulent shell factory scheme by providing a range of legal services without which the shell

companies could not have registered the public sale of their securities and remained public

companies.  Strum's work included:

      a.     Assisting Swartz in drafting and filing the shell companies' S-1 registration

statements and amendments, and shepherding the filings through the Commission's process

until they were declared effective;

      b.     Drafting opinion letters and attorney consent letters (based on templates

provided by Swartz) in support of the shell companies' S-1 registration statements and

amendments;

      c.     Responding to comments and questions from Commission staff about the

shell companies' S-1 registration statements (including questions concerning the companies'

purported directors and officers, their business plans, and their shell and blank-check status);

      d.     Drafting letters to the Commission staff (purportedly signed by the named

directors and officers) requesting that the effectiveness of the companies' S-1 registration

statements be accelerated;

      e.     Drafting transfer agent opinion letters representing that the shell companies

had the requisite corporate power and authority pursuant to board resolutions to sell and

issue securities and that their shares had been properly and validly issued in compliance with

applicable federal and state securities laws;

   f.  Assisting Swartz in drafting certain periodic reports of the shell companies, and authorizing the companies' agents to file them with the Commission;

   g.  Establishing bank accounts for certain of the companies and providing access to those accounts to the Perlstein Group; and

   h.  Assisting in drafting board of directors resolutions.

32. For his work with respect to the shell companies, Strum was paid approximately $68,000 by the Perlstein Group.

### III. Strum's Intentional or Reckless Conduct

33. During the course of his work with Swartz on behalf of the shell companies, Strum encountered numerous red flags indicating (a) that the Perlstein Group, and not the purported directors and officers, controlled the shell companies, and (b) that the shell companies had no intention of carrying out their stated business plans, and instead were products of a shell factory that the Perlstein Group intended to sell through reverse mergers or other changes in control.

34. Strum, however, did not respond appropriately to the red flags, nor did he independently verify the management of the shell companies or truthfulness of the representations made in the S-1 registration statements and periodic reports that he participated in drafting.

35. From time to time, Swartz and Yaron sent Strum checklists that (a) listed the various shell companies for which Strum was providing legal services, (b) outlined the status of each shell company in the S-1 registration process, and (c) noted what further work needed to be done and by whom. Strum, in turn, sent emails to Swartz, and not to the shell companies' managements, with updates on his work concerning various shell companies.

36. Swartz and Yaron were Strum's primary points of contact and sources of information for his work with regard to the shell companies. Strum relied on Swartz almost

exclusively to supply the necessary information and make decisions concerning the S-1 registration process and related matters.

37.     Despite relying on Swartz for his work concerning the companies, Strum never asked Swartz for any documentation to support the statements made in the opinion letters that Strum drafted at Swartz's request and sent to the companies' transfer agents.

38.     Despite Swartz's apparent decision-making authority with regard to the shell companies, Strum did not initially ask Swartz to explain Swartz's role with the shell companies. Swartz had told Strum on at least two occasions — once in 2011, when Swartz first approached Strum about doing work for the shell companies, and again in 2012 — that Swartz did not want to be publicly identified or associated with the shell companies.  At either time, Strum did not ask Swartz why he did not want to be associated with the shell companies.

39.     Strum also communicated frequently with Yaron concerning the shell companies. On at least one occasion, Yaron instructed Strum to always copy the relevant shell company's email address on his messages, but to blind copy her address when he communicated with third parties. Strum never asked Yaron why she instructed him to blind copy her on his communications with third parties concerning the shell companies.

40.     At Yaron's direction, Strum also opened bank accounts for at least ten of the shell companies, and provided the banks with board resolutions and other corporate documents concerning those shell companies that Yaron had sent him, which purported to establish Strum's authority to act on behalf of the shell companies.  Strum then provided the bank account login and password information, as well as the debit card information associated with the bank accounts, to Yaron, without seeking permission from the shell companies' purported directors and officers to do so.

41.     In opening the bank accounts for at least six of the shell companies, Strum identified himself to the banks, variously, as those shell companies' General Counsel, Secretary, or Assistant Secretary, even though he never held any of those positions with any of the shell companies.

42.     Strum also often sent invoices for his services to Yaron or Swartz, instead of, or in addition to, the purported managements of the respective shell companies.

43.     Despite Yaron's apparent significant involvement with all of the shell companies, Strum never inquired as to her role with the shell companies.

44.     Strum never asked to speak with the shell companies' purported directors and officers and never spoke or met with any of the shell companies' directors and officers.

45.     Strum occasionally sent emails to the shell companies' email addresses, which had been provided to him by Swartz or which were listed in the draft S-1 registration statements sent to him by Swartz.  But even when Strum directed a question to a particular shell company officer or director, it was Swartz, and not the director or officer, who often responded to the questions.

46.     Strum's sole basis for believing that the purported directors and officers existed and controlled the shell companies were (1) that their names were listed in the S-1 registration statements that Swartz had sent him and (2) that communications occasionally were sent to him from the shell companies' email addresses.

47.     Strum eventually became aware that none of the shell companies had made progress toward implementing their respective business plans, even after shares had been issued to the public, and expenditures had been made for professional fees.

48.     On several occasions in the course of preparing certain shell companies' periodic reports, Strum sent emails to Swartz in which he expressed concern that a lack of corporate business

activity could be a red flag for the Commission staff and alluded to the potential for an investigation.

49.     For example, with respect to Secure It's Form 10-Q, Strum wrote to Swartz that, "[I] appreciate the work and want more, but this won't pass a smell test.  I want to keep us in the clear  . . . if I were an SEC person and read ths [sic] . . . I wld [sic] call them in."  In the same message, Strum insisted that if the company paid a consultant, "it must have been for somethibg [sic] Even [sic] made up. . . . (Just trying to CYA)."

50.     Strum raised similar concerns with respect to Epsilon's Form 10-K, emailing Swartz: "I hate to be a pain but it is my ass they will come for."

51.     Strum never attempted to raise such concerns with anyone other than Swartz.

52.     At some point in late 2012, Strum began to suspect that, contrary to the representations made in the respective shell companies' S-1 registration statements concerning their business plans, Swartz's actual plan was to profit from selling the shell companies.

53.     Strum confronted Swartz about his suspicions, and Swartz explained that no additional progress toward the shell companies' business plans was required.  Although Swartz's explanations were not satisfactory to Strum, Strum continued to work with Swartz on matters related to the shell companies because Swartz was his friend.

54.     As early as 2012, Swartz told Strum that he, Yaron, and Perlstein controlled the shell companies, and began informing Strum when each company was sold.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 17(a) of the Securities Act
### [15 U.S.C. §§ 77q(a)]

55.     Paragraphs 1 through 54 are realleged and incorporated by reference herein.

56.     As alleged above, the Perlstein Group violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

57.     Strum knowingly or extremely recklessly provided substantial assistance for the Perlstein Group's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].  Strum knew or was extremely reckless in not knowing that the Perlstein Group was engaging in securities fraud and that he was providing substantial assistance to the Perlstein Group in perpetrating the violations.

58.     By engaging in the conduct described above, Strum aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], and, unless enjoined, is reasonably likely to continue his violative conduct.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

59.     Paragraphs 1 through 54 are realleged and incorporated by reference herein.

60.     As alleged above, the Perlstein Group violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

61.     Strum knowingly or extremely recklessly provided substantial assistance for the Perlstein Group's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Strum knew or was extremely reckless in not knowing that the Perlstein Group was engaging in securities fraud and that he was providing substantial assistance to the Perlstein Group in perpetrating the violations.

62.     By engaging in the conduct described above, Strum aided and abetted the Perlstein Group's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(e) of the Exchange Act [15

U.S.C. § 78t(e)] and, unless enjoined, is reasonably likely to continue to his violative conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

A.  Permanently enjoin Strum from violating Section 17(a) of the Securities Act [15

U.S.C. § 77q(a)];

B.  Permanently enjoin Strum from violating Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

C.  Order Strum to disgorge, with prejudgment interest, all ill-gotten gains received

as a result of the conduct alleged in this Complaint;

D.  Grant such other and further relief as the Court deems just and appropriate; and

E.  Retain jurisdiction of this action in accordance with the principles of equity and

the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

and decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of this Court.


Date:   February 16, 2018                        _____/s/ Daniel J. Maher_____
                                                 Daniel J. Maher, Mass. Bar No. 654711
                                                 Securities and Exchange Commission
                                                 100 F Street, N.E.
                                                 Washington, D.C. 20549
                                                 Tel: (202) 551-4737
                                                 Fax: (202) 772-9292
                                                 Email: maherd@sec.gov

Of Counsel:
Antonia Chion
        District of Columbia Bar No. 358014
Yuri B. Zelinsky
        Maryland Bar No. 8105010278

- 14 -

Greg Hillson
     District of Columbia Bar No. 1000935